## Case No. 11,714.

### The REVENUE CUTTER, NO. 2.

#### [4 Sawy. 143.] [1]

District Court, D. Oregon. Jan. 2, 1877.

SHIPPING — BUILDING VESSEL — MARITIME CONTRACTS—POSSESSION — LIEN FOR MATERIALS — GOVERNMENT CONTRACT.

1. Upon a contract to build and deliver a vessel after a successful trial trip at sea, although the party for whom it is built, in pursuance of the contract, inspects and approves the work as it progresses, and makes payments thereon in proportion to such progress, said party does not thereby become the owner of such vessel, nor until the final completion and delivery thereof.

2. A vessel launched and afloat upon the navigable waters of this district is a vessel built, and a contract to furnish materials for her equipment is a maritime one. The ruling in The Eliza Ladd [Case No. 4,364] affirmed.

[Cited in The Manhattan, 46 Fed. 800.]

3. A party contracted with the United States to build and deliver a vessel after a successful trial trip at sea, and the latter, in pursuance of the contract, kept a superintendent at the vessel during the progress of the work, with power to reject or approve any material used in her construction. *Held*, that the contractor was in possession during the progress of the work, and not the United States, and that the vessel was not exempt from the process of this court in a suit to enforce a lien against her for materials furnished for her equipment at the request of the contractor.

4. The builder under such contract having failed to perform the same, and the contract being that the United States might in such case, at the option of the secretary of the treasury, complete the work at the expense of the contractor. *Held*, that until such option was exercised, the vessel was not and could not rightfully be taken into the possession of the United States, and that when it was, the United States would take possession merely as the agent of the contractor to finish the vessel for and on the account and risk of the latter.

[See Corbett v. Woodward, Case No. 3,223.]

Suit to enforce lien for labor and materials furnished to rig and equip the vessel called the United States Revenue Cutter.

Cyrus A. Dolph and Charles B. Upton, for libellants.

Rufus Mallory and W. Lair Hill, for claimant.

DEADY, District Judge. On November 28, the libellants, J. W. Coffin and Charles J. Hendry, of San Francisco, filed their libel against "the vessel known as the United States Revenue Cutter," to enforce an alleged lien upon said vessel for the sum of $3,659.20, arising out of the furnishing of labor and materials by said libellants to rig and equip the same, at the request of the owner thereof, the Oregon Iron Works.

On December 9, the United States intervened, and filed a claim and answer of ownership and possession of the property [See Case No. 11,712], and on December 19, and pending the hearing, had leave to file an amended answer, in which it is further alleged that the materials and labor furnished by the libellants were furnished "for the construction of a domestic vessel, the said Revenue Cutter in her home port," and therefore this court has no jurisdiction in the case.

From the evidence it appears that, on May 28, 1875, the United States, by the secretary of the treasury, entered into a contract with Edwin Russell, the president of the Oregon Iron Works, a corporation formed under the laws of Oregon, whereby the latter became bound, on or before February 28, 1878, to "build and deliver, afloat and complete in all respects, and ready for service," to the United States, at the port of Albina, opposite Portland, Oregon, "a steam-propeller, of about two hundred and twenty-seven tons burden, * * * the same to be adapted in every respect to the uses and purposes of a revenue steamer," according to the specifications attached; "to be subject to the inspection and approval of a superintendent appointed by the secretary of the treasury, with full power to reject or approve any materials or articles used in the construction or equipment of said vessel, and at any stage of the work before final approval, as hereinafter provided."

The contract also provides "that full access to the work and full facilities for the inspection of the same shall at all times be afforded to the person or persons selected by the secretary of the treasury. Said steam-propeller to be substantially built, with * * * fuel for satisfactory trials of the machinery, and also for the final trip, of not less than twenty-four hours at sea"; and that in case of the failure of the iron works "to fulfill the stipulations" of the contract on its part, "the secretary of the treasury is authorized to direct purchases to be made of all the necessary materials, and cause the

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

construction and equipment of the vessel to be completed as herein specified and requir-ed; and the said iron works shall be liable to the United States, in such event, for any excess of the cost of the vessel over the price hereinafter named and stipulated to be paid therefor to said iron works; and in case of delay beyond the date hereinbefore-men-tioned for the completion and delivery of the vessel, there shall be deducted $30 per day from the last payment, in the discretion of the secretary of the treasury, for each and every day that the completion and delivery may be delayed beyond the time specified in this contract."

Provision for the payment of the con-tractor is made as follows: "That for the aforesaid steam-vessel, finished, furnished and delivered as herein provided, there shall be paid to the iron works by the United States the sum of $92,000," in five equal in-stallments, to become due at specified points in the progress of the work; concerning the fifth of which it is provided: "And, lastly, when the vessel, with engine, boiler, etc., is satisfactorily completed, and after a success-ful trial trip at sea of not less than twenty-four hours, at the expense of the iron works, and the vessel and equipments shall be found in every respect complete, according to the specifications and the conditions of this contract, the final sum of $18,400 shall be paid, less such sum as may be deducted for the failure to complete the vessel at the time specified, as hereinbefore provided for."

The contract also provides, "that the above payments shall be made only upon the pro-duction of certificates from the superintend-ent of construction to the effect that the work of construction has progressed satis-factorily to the points above indicated; and before the last payment, that the vessel and machinery are satisfactory in all respects, and the trial trip successfully made."

Contemporary with the making of this contract. a bond was given to the United States by the iron works, with sureties, in the sum of $46,000, conditioned that the lat-ter or its successors "shall well and truly perform the stipulations" of said contract.

On June 15, 1875, the secretary of the treasury assigned Captain John W. White, of the revenue marine, "to duty as superin-tendent of the construction" of this vessel, and instructed him to "inspect the materials used in the work, and reject such as may be found unsuitable"; to "require a strict com-pliance with the terms of the contract and specifications on the part of the contractor, and in every proper manner care for the in-terests of the government in accordance with the generally understood duties of a superintendent of construction."

The construction of the vessel was com-menced in due season, under the superin-tendence of Capt. White and his assistant, Lieutenant Brenn, but, for some reason, the work did not progress as was expected.

However, by August 24, 1876, the hull was built and launched, and was then navigated a short distance up the Wallamet river to the Albina wharf, for the purpose of being equipped. At this point, in the months of September and October, the libellants fur-nished the labor and materials in question. The first four payments were made by Au-gust 23, 1876, and at the time the vessel was seized under the process issued in this suit it would take about $5,000 in gold coin to complete her according to contract.

On November 1, the iron works suspended work and have not since resumed, being, in fact, proceeded against in bankruptcy on Oc-tober 31. During the progress of construc-tion the iron works occupied the vessel with its workmen, and kept a night-watchman on board. The latter remained on duty until November 15, but received his wages, after November 1, from Edwin Russell, the presi-dent and manager of the company. On ac-count of the advanced condition of the work the superintendent, about September 1, got authority from the secretary of the treasury to employ two additional men to watch and help take care of the vessel, who were em-ployed in keeping the decks clean and line fast and wetting paint-work, and are still on the vessel.

After the suspension of the iron works, Mr. Brenn locked up the cabin, ward-room and sail-room, in which were deposited cer-tain articles of ships' furniture belonging to the United States, such as a compass, lan-terns and leads, and gave the keys to the watchman employed by the government. The vessel was seized under the process of this court on November 29. By direction of the secretary of the treasury, the superin-tendent was absent from the vessel during said month. Nothing was done by the gov-ernment after the failure of the iron works and the seizure in this case to complete the contract, or in any wise change its relation to the vessel.

The seizure being reported to the secretary of the treasury, he telegraphed the superin-tendent on November 29: "Confer with dis-trict attorney with view of government get-ting possession of and completing vessel un-der construction by Oregon Iron Works for revenue marine; make further demand on contractor to complete vessel if district at-torney so advises; report all facts to de-partment by telegraph and await further orders." On December 2 the secretary tele-graphed again as follows: "Consult district attorney, and get legal possession of new revenue vessel, and complete same accord-ing to Oregon Iron Works contract." And also on the sixth of same month: "When put in possession of new revenue vessel, complete same under terms and contract with Oregon Iron Works; take vessel to San Francisco, if best for interest of govern-ment. * * *"

Upon this state of facts the law is, that

at and before the time of the seizure the vessel was the property of the iron works. The contract was for the construction and delivery of a thing not then in esse. The iron works was "to build and deliver, afloat and complete, in all respects ready for service," a steam-propeller, and by the terms of the contract this delivery could not be made till the vessel had made "a successful trial trip at sea of not less than twenty-four hours." Under such a contract the party for whom the vessel is built acquires no property therein during the progress of the work, nor until the completion and delivery of the same. Andrews v. Durant, 11 N. Y. 40, and cases there cited.

The fact that the purchase price of the vessel was to be paid in installments as the work progressed, and the further fact that the construction was to take place under the superintendence of an agent of the United States, who was authorized to reject or approve any materials used in the construction or equipment of such vessel, are not sufficient to modify or overcome the plain and positive provisions of the contract, to the effect that the delivery is to take place upon the final completion and successful trial trip of the vessel. The appointment and inspection of the agent were merely a prudent and convenient means to secure the faithful performance of the contract, but the United States did not thereby become bound to accept the vessel when completed, if, upon her trial trip, she should not prove to be well built and equipped, "and in every respect complete, according to the specifications of the contract." As was said by Denio, J., in Andrews v. Durant, supra (page 44), concerning a similar provision in a building contract: "Many of the materials of which a vessel is composed are ultimately covered so as to be concealed from the eye when it is finished, and as the safety of life and property is concerned in the soundness and strength of these materials, it is but a reasonable precaution to be taken by one who engages a vessel to be constructed, to ascertain as the work progresses that everything is staunch and durable, and such a provision, as it seems to me, does not tend to show a design that there shall be a change of property as fast as any materials or work are inspected or approved. It amounts only to an agreement that when the whole is completed the party will receive it in fulfillment of the contract."

The stipulation for payments at particular stages of the work is a usual and almost necessary one in contracts involving a large expenditure. Without it, it may be safely assumed that the contractor would demand and receive a greater sum for the same work. It is a mere arrangement for distributing the burden of expenditures incident to such a contract between the parties, and, as was said in Andrews v. Durant, supra (page 45), "only shows that the party advancing is willing thus to assist the artisan, provided he can see that the work is going on in good faith, so as to afford a reasonable prospect that he will realize the avails of his expenditure in a reasonable period."

The American authorities are uniform upon this question, although the English courts, since the case of Woods v. Russell, 5 Barn. & Ald. 942, decided in 1822, have held otherwise. In 2 Pars. Cont. (5th Ed.) 258, the author, after stating the question, "If a ship be built on a building contract, and the price is to be paid by installments, does each installment when paid purchase the fabric as it then exists, passing the property absolutely to the purchaser, subject only to the lien which the builder has for the purposes of finishing the ship?" says, "The law is now well settled, especially in this country and by recent cases," and then states it as follows: "If it be the intention of the parties that the builder should sell and the purchaser buy the ship before it is completed, and at different stages of its progress, and a bargain is made sufficiently expressive of this intention, there is no reason whatever why the law should not enforce such a bargain. But no such bargain would be implied from the mere fact that payment is to be made by installments, whether they are graduated merely on time or on the state or condition or progress of the ship. Nor would this implication arise from, or be greatly aided by, the employment by the purchaser of a superintendent. These facts might assist in identifying the structure, or sustaining an action for a breach of the contract, and they might bear on the amount of the damages. But they would not be sufficient to prove an actual sale and transfer of the property by the payment of an installment, so that after such payment, if the property were lost or destroyed, it would be the loss of the purchaser."

This statement of the law is fully sustained by the following cases: Merritt v. Johnson, 7 Johns. 473; Andrews v. Durant, 11 N. Y. 40; Low v. Austin, 20 N. Y. 182; The Revenue Cutter No. 1 [Case No. 11,713]; Scull v. Shakespeare, 75 Pa. St. 297; Edwards v. Elliott, 36 N. J. Law 449; Haney v. The Rosabelle, 20 Wis. 261; Tompkins v. Dudley, 25 N. Y. 272.

No American cases have been cited to the contrary, unless it be the dictum of Clifford, J., cited by claimant from the dissenting opinion in Calais S. Co. v. Van Petts, 2 Black [67 U. S.] 384, in which it is incidentally said that "where an entire vessel is agreed to be built by a contractor, no property vests in the party for whom she is built until she is ready for delivery, and has been accepted or approved by such party" (citing Mucklow v. Mangles, 1 Taunt. 318; Stringer v. Murray, 2 Barn. & Ald. 248; Merritt v. Johnson, supra; Abb. Shipp. 5), but that such "rule does not prevail where the vessel is constructed under the superintendence of the-

party for whom she is built, or his agent, and payments for her, based upon the progress of the work, and to be made by installments as the work is done," and that in such "cases the person for whom the vessel is built is regarded as the real owner by the well considered decisions upon the subject" (citing Woods v. Russell, supra, and the English cases following it, but no American case, except Andrews v. Durant, supra, which is one of the most decided cases to the contrary). It is said that Homer sometimes nods, and it would appear that this dictum of this distinguished and eminent jurist and judge was inadvertently or unadvisedly made.

But the bond taken from the contractor in this case being only in a sum equal to half the contract price, it is claimed that this shows it was not the intention of the United States to rely upon that alone as security for the first four installments, and that it was the intention of the parties to the contract that the property in the fabric should vest in the government as fast as such installments were paid, and as a security therefor.

But according to the adjudged cases, if the contractor had given no bond at all, the property in the thing under this contract would remain in the builder until the final completion and delivery of the vessel. This being so, it is difficult to perceive how the execution of a bond in half the contract price for the faithful performance of the contract could have the effect to change it in this respect, or show that the parties to it entered into it with any intention other than that which appears upon its face. Neither is it material to consider whether this contract is, upon this view of it, a provident or improvident bargain upon the part of the United States, for, however that fact may be, it would furnish no sufficient reason for giving it a singular or extraordinary construction. But so far as appears, the government has ample means under the contract to protect itself. The law being that the payment of the installments binds the builder to finish and deliver the identical vessel which they have been used to construct (Andrews v. Durant, 11 N. Y. 41), under the circumstances it would be almost impossible to dispose of the property to an innocent purchaser, so as to deprive the government of this security for the payments. Besides, before making a payment, the United States can ascertain, through its superintendent, if the accounts for labor and materials have been so far satisfied, and if not, an amount equal thereto may be withheld from the contractor or directly applied to their payment; in addition to which it may rely upon the bond for indemnity in case it is compelled, or, from a proper sense of justice, consents to pay an unsatisfied claim for work or materials used in the construction of the vessel, and which constitutes a lien thereon. A contract "to build and deliver" a vessel, "afloat and com-

plete in all respects," is hardly complied with while any valid lien or incumbrance, growing out of the acts or conduct of the builder, exists upon it.

The libellants having furnished labor and materials, at the request of the Oregon Iron Works, to equip a vessel then belonging to said corporation, by the local law (Or. Code, p. 656, § 19) they have a lien thereon for the value thereof. But, admitting this fact, the claimant objects that the court has no jurisdiction to enforce such lien, because said labor and materials were "used in the construction of a domestic vessel in her home port"; in other words, that the contract of the libellants was to furnish materials to build a vessel, and is, therefore, not maritime.

So far as this court is concerned, this question was decided in the case of The Eliza Ladd [Case No. 4,364]. It was there held that a contract "to equip, fit or furnish a vessel after she is launched and afloat is a maritime contract." The materials of which a vessel is composed, said the court in that case, "being put together in a certain form so as to float upon the water and transport or bear up freight or passengers," becomes a ship "at the moment when she leaves the ways and her keel strikes the element for which she was originally designed. That is the moment of her birth as a ship, and the occasion when a name is usually bestowed upon her. Thereafter all contracts to equip, furnish or repair this machine have direct reference to a vessel in esse, with capacity for locomotion and transportation on navigable waters, and are therefore maritime."

Following this decision, the soundness of which I have yet no cause to doubt, the objection to the jurisdiction is not well taken. This vessel was built, launched and afloat upon the navigable waters of this state, within the ebb and flow of the tide, when the libellants furnished these materials. They consist of chains, anchors, cordage, ropes and sails, and were used in rigging and equipping a ship already in existence and afloat. The contract being maritime, and the local law giving a lien for the price of the material, it may be enforced in the admiralty. The Lottawana, 21 Wall. [88 U. S.] 579.

But, admitting the maritime nature of the contract, and the lien of the libellants, the claimant further objects that they cannot maintain this suit, because, as it alleges, the property is and has been in its possession "at all times during the construction thereof." In support of this position, the case of The Davis, 10 Wall. [77 U. S.] 15, is cited and relied upon.

That case decides that a party may acquire a lien upon property while the ownership is in the United States, and that such lien may be enforced whenever it can be done without taking the property out of the possession of the United States. And here it may be remarked, that upon the authority of this case,

the libellants acquired a lien upon this vessel, even if under the contract of construction she was the property of the United States, as claimed by the claimant from the payment of the first installment. For even upon that view of the matter, the contractor, who was required by the contract to provide the labor and materials necessary for her construction and equipment, was, while so doing, the agent of the owner, the United States. But it being thought material, in considering the question of possession, to know in whom was the ownership of the property, that matter has been first ascertained.

As to what is a possession by the United States sufficient to protect or exempt the property from the process of the court, and thereby prevent a party from enforcing a valid lien thereon, the court, in the case of The Davis [supra], say: "The possession which would do this must be an actual possession, and not that mere constructive possession which is very often implied by reason of ownership, under circumstances favorable to such an implication. We are speaking now of a possession which can only be changed under process of the court, by bringing the officer of the court into collision with the officer of the government, if the latter should choose to resist. The possession of the government can only exist through some of its officers, using that phrase in the sense of any person charged on behalf of the government with the control of the property, coupled with its actual possession. This, we think, is a sufficiently liberal definition of the possession of property by the government to prevent any unseemly conflict between the court and the other departments of the government, and which is consistent with the principle which exempts the government from suit and its possession from disturbance by virtue of judicial process."

Under this rule, the court held in that case that cotton belonging to the United States, in the hands of a common carrier, to whom it had been delivered by an agent of the United States to transport and deliver to another such agent, was not in the possession of the United States, and was therefore liable to be seized in a suit to enforce a lien against it for salvage. In considering this question of possession, the court also say that the absence in this country of any power in the officers of the government "to submit a case to the jurisdiction of the court as that exercised in England seems to justify a liberal construction of the rule on which we are to act in favor of the promotion of justice"; in other words, that the absolute exemption of the property of the government from the lawful claims of the citizen is in its nature an odious and unjust rule, and therefore ought not to be favored by the courts.

Tried by the light of the circumstances and the rule in the case of The Davis, I am unable to see on what ground it can be claimed that the United States was ever in posses-

sion of this vesssel. The contract is the test and measure of the relations and rights of the respective parties. Under it the superintendent was not a "person charged on behalf of the government with the control of the property," but only with the duty of being present and inspecting and rejecting or approving the material provided by the contractor for the construction of the vessel; for which purpose the contract provides that he shall have "full access to the work and full facilities for the inspection" of the same. Beyond this the contract gave him no authority or control, and this is not possession nor anything which savors of it. And if in fact he acquired any possession not authorized by the contract and his instructions, such possession would not be that of the United States, but the possession of a stranger, and possibly a trespasser. The possession necessary to exempt the property from the process of the court must be rightful, according to law, and it is not shown how such a possession can exist without a general or special property in the thing being in the government at the same time.

By the terms of the contract, the vessel was the property and in the possession of the contractor until completed and delivered to the United States, after a successful trial trip at sea for twenty-four hours. During this period she was under the control and at the risk of the contractor. If she was destroyed by fire or even sunk at sea in a storm while making her trial trip there would be a failure to perform the contract, and the loss would fall upon the owner, the Oregon Iron Works. Tompkins v. Dudley, 25 N. Y. 272, and the cases there cited.

But in case of the failure of the contractor "to fulfill the stipulations" of its part of the contract, it is provided that "the secretary of the treasury is authorized" to direct the purchase "of all the necessary materials and cause the construction and equipment of the vessel to be completed" as provided in the contract, and at the expense of the contractor. And now it is claimed that the iron works, having given notice on November 1 of its inability to further proceed with the contract, that the vessel is, by reason of that fact, in the possession of the United States since that date.

The United States is not bound, in case of the failure of the contractor, to take possession and complete the vessel. It has the option, and it may do so, or it may elect to rely upon its bonds, or the liability of the contractor, or both. Up to the time of the seizure it had done nothing toward the exercise of this option. Its officers and employés continued in the same position and relation to the property from the time of the suspension of the contractor to the seizure that they had before. Nothing was done toward the completion of the vessel, and the superintendent had no instructions from the secretary to take possession and proceed with the work, and

therefore he was not authorized to do so, and did not. When the secretary was advised of the seizure, he telegraphed to the superintendent substantially to get possession of the vessel and complete her under the terms and contract with the iron works.

It is claimed by counsel for claimant that the statements in these telegrams are not to be treated as an admission by the United States; that it was not then or had not been, in the possession of the property, but rather as an assertion that it had been deprived of its possession by the process of the court, while instructing its officer to get it back again. The explanation is ingenious and plausible, but I think the more reasonable inference, from all the facts, is that the secretary did not consider that the vessel had yet been in the possession of the United States. If the instruction had been given upon the theory assumed by counsel, the language of it would more likely have been, not simply "get the possession"—"get the legal possession"—but "get back or regain the possession." But, be this as it may, the mere assumption or impression of the secretary that the United States was in possession would not make it so in fact. So far as appears from the evidence, the United States, by these telegrams, first attempted to exercise its option under the contract, and take possession and complete the vessel. But in the meantime she has been taken possession of by the marshal, under the process of this court, as the property of, and in the possession of the iron works, at the suit of citizens who have a valid and subsisting lien upon her for materials used in her equipment, and furnished by them at the request of the builder while she was in the possession of the latter, and doubtless upon the faith of such security. If, under these circumstances, the United States desires to get possession of the vessel for the purpose of completing her, and protecting its interests therein, it is meet and right, and so is the law, that it shall first satisfy this lien of the libellants.

But, even supposing that the United States had exercised its option before the seizure herein, and was then engaged in completing the vessel under the contract with the iron works, I seriously doubt whether its possession would be sufficient to defeat this suit. As against the libellants, its possession, it appears to me, would be merely that of the iron works, for whom and on whose account it was finishing the vessel in a certain contingency expressly provided for in the contract.

It would not be the owner of the vessel, or have any other right or interest therein than it had before exercising such option. It would complete the vessel at the expense of the iron works, even if it cost more than the stipulated price, and the latter and its bondsmen would be liable for the excess. By exercising such option it would not thereby accept the vessel, or be bound to accept it, when completed, unless it proved satisfactory upon the final trial trip. Of course, in undertaking to complete the vessel for the iron works, it would be bound to exercise ordinary skill and diligence in the care of and work upon the property, and could not rightfully refuse to accept it for any cause which was the result of its own negligence or want of skill. But subject to this limitation, the vessel would be at the risk of the contractor until received, and be subject to be rejected if it did not in all respects come up to the requirements of the contract.

There must be a decree for the libellants.