THE POCONOKET.

BACON v. THE POCONOKET.

(District Court, E. D. Pennsylvania. March 22, 1895.)

No. 9.

1. CONSTRUCTION OF CONTRACT—SALE OF VESSEL—WHEN TITLE PASSES—PAYMENTS *DURING* CONSTRUCTION.
   The rule in this country (contrary to that in England) is that under a contract for the sale of a vessel, to be paid for as the work progresses, the title remains in the seller until delivery, in the absence of any provision indicating an opposite intent; but the question is one of intention, purely.

2. SAME.
   Where a vessel was to be built under a contract providing for payment by installments as the work progressed, *held*, that the question whether title passed immediately to the purchasers was not determined in the negative by the fact that the contract gave them a right, in certain contingencies, to reject the vessel after completion and recover the money paid; nor in the affirmative by the fact that part of the earlier installments was to be paid in bonds of the purchasing company, secured by mortgage, which was to include the vessel herself, together with other specified property.

3. SAME—PAROL EVIDENCE.
   Where a contract provides for the purchase of a vessel, to be paid for as the work of construction progresses, without any express provisions indicating the intent of the parties as to whether title shall pass before delivery or not, it is competent to prove a parol agreement, made before execution of the contract, that the title should pass when work was commenced, as there is nothing in such an agreement which tends to contradict or vary the written contract.

4. SAME—FRAUD.
   Where it appears that in consideration of such a parol agreement the purchasing company reduced its demand as to the amount of security required of the builders for repayment of the advances in case the contract was not satisfactorily performed, it would be a fraud upon the purchasers to permit the repudiation of such agreement, for the intent to repudiate, as manifested at the trial, would (under the Pennsylvania decisions) relate back to the date of the contract, and constitute a fraud in its procurement, such as would justify its reformation in equity.

**5. CORPORATIONS — CONTRACTS BY OFFICERS — ESTOPPEL BY ACCEPTING BENE-FITS.**

A corporation which accepts the benefits flowing from a parol agreement made by one of its officers in connection with a written contract is estopped to repudiate such agreement.

This was a libel by Nathaniel T. Bacon against the steamship Poconoket.

Henry B. Clossom, J. Rodman Paul, and N. Dubois Miller, for libelant.

H. G. Harris, John A. Burton, Edward F. Pugh, and Henry Flanders, for respondents.

BUTLER, District Judge. The controversy arises out of the following contract:

This agreement made this third day of March, 1893, by and between the Cowles Engineering Company, hereinafter called the "Cowles Company," a corporation existing under the laws of the state of New Jersey, of the first part, and the Interstate Steamboat Company, hereinafter called the "Interstate Company," a corporation existing under the laws of the state of New Jersey, of the second part, witnesseth:

First. The Cowles Company for and in consideration of the agreements hereinafter contained, to be kept and performed by the Interstate Company, and of the moneys hereinafter mentioned to be paid to it by the Interstate Company, covenants and agrees to construct, build and complete for the said Interstate Company, one twin-screw, steel-hull, passenger steamer of not less than one hundred and sixty-two (162) feet long over all, of not less than twenty-nine (29) feet extreme beam over all, with not over four (4) feet draught, when coal and regular crew are on board; the said steamer to be equipped with two compound engines with suitable boilers, condenser, and pumps, agreeably to the specifications hereto attached and forming a part of this agreement, and to deliver the same to the Interstate Company, in the water, at the works of the Cowles Company, foot Forty-Fourth street, South Brooklyn, N. Y., on or before August 22, 1893.

Second. The Cowles Company agrees that the said steamer shall attain a speed of 16 miles an hour through the water in a one hour's run, upon a straight course, in smooth water, with not more than four (4) tons load on board; it being understood that the Cowles Company is to have the choice of the course and to conduct the trials and that if a straightaway course of 16 miles should not be selected, any time consumed in making turns shall be deducted and that chart measurements of the latest United States coast survey shall be accepted as accurate.

Third. The Interstate Company for and in consideration of the agreements hereinbefore contained to be kept and performed by the Cowles Company, covenants and agrees to pay or cause to be paid to the Cowles Company for the said steamer, the sum of fifty thousand dollars ($50,000) to be paid as follows, to wit: 1st, 10 per cent. ($5,000) on the signing hereof; 2nd, 25 per cent. ($12,500) when all the steel for said steamer is in the yard and shops of the Cowles Company and being worked upon; 3rd, 25 per cent. ($12,500) when the said steamer is in frame; and the principal forgings, castings, plates and tubes for the engines and boilers are in the shops of the Cowles Company and being worked upon; 4th, 25 per cent. ($12,500) when said steamer is launched; 5th, 15 per cent. ($7,500), being the balance, upon the completion of the steamer, in accordance with this agreement and the said plans and specifications and upon her attaining the speed aforesaid.

Fourth. It is mutually agreed that if for any reason the Cowles Company is not satisfied with the result of the first trial of speed of said steamer, it shall have the privilege of further trials to demonstrate the true power and speed of the steamer, and that when the Cowles Company is prepared to make trials of

the speed of said steamer, it shall notify the Interstate Company in writing, by letter or telegram, addressed to it at Bordentown, New Jersey, at least two days previous thereto, of the times and places of such trials.

Fifth. It is mutually agreed that the Interstate Company may pay five thousand dollars ($5,000) of the fourth payment of $12,500, above mentioned, and five thousand dollars ($5,000) of the fifth payment of $7,500, above mentioned, in its bonds, payable $5,000 thereof not later than August 1st, 1895, and $5,000 thereof not later than August 1st, 1896, bearing 6 per cent. interest, payable semiannually, and secured by a first mortgage upon the real estate located at Bordentown, New Jersey, now owned and occupied by said Interstate Company and described as follows:

All that certain tract of land on the shore of the Delaware river, in the city of Bordentown in the county of Burlington and state of New Jersey, and bounding on Crosswick's creek, lying between the stone wall of the Camden and Amboy Railroad and Transportation Company and low-water mark on said creek: beginning say five hundred feet below the wharf where the storehouse now stands at a stake standing at the foot of said stone wall and runs (1) a southerly course along said stone wall of the Camden and Amboy Railroad and Transportation Company two hundred feet; thence (2) a northerly course one hundred and fifty feet more or less to low water mark on Crosswick's creek; thence (3) an easterly course following the line of said Camden and Amboy Railroad and Transportation Company; thence (4) a southerly course along the line of said railroad company's land, one hundred and fifty feet more or less to the place of beginning.

Together with all and singular, the buildings, improvements, woods, ways, rights, liberties, privileges, hereditaments and appurtenances to the same belonging or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof and of every part and parcel thereof. And also the estate, right, title, interest, property, possession, claim and demand whatsoever, both in law and equity, of the said party of the second part, of, in and to the said premises with the appurtenances; as well as by a first mortgage upon the steamer Florence, now owned by said Interstate Company, as well as the steamer to be constructed under this agreement and all its personal property and franchises, the whole issue of said bonds not to exceed twenty-six thousand dollars ($26,000), and the said Interstate Company to furnish to the Cowles Company evidence satisfactory to the Cowles Company that the said bonds are secured as aforesaid by a mortgage or mortgages, to a trustee to be approved by the Cowles Company, and which shall be a first lien upon the said premises and property; said mortgages to contain tax, interest, and fire and marine insurance clauses, satisfactory to the Cowles Company.

Sixth. It is mutually agreed that in case the Cowles Company shall not complete said steamer in accordance with the terms thereof on or before the 22nd day of August, 1893, it shall forfeit to the Interstate Company the sum of one hundred dollars ($100) per day as damages for each day's delay after that date in the completion of said steamer, to be deducted from the amount of the bonds which the Interstate Company may pay on the final payment as above provided.

Seventh. It is mutually agreed that from time to time as payments become due, the Cowles Company shall furnish to the Interstate Company a statement of the materials in place in said steamer or in process of construction and generally the state and condition thereof at that time.

Eighth. It is mutually agreed that if the said steamer shall not be completed within two months after the time hereinbefore fixed for her completion, the Interstate Company may accept or reject her upon her completion; and that if it does then reject her the Cowles Company shall repay with interest to the Interstate Company all sums paid to the Cowles Company under this agreement.

Ninth. It is mutually agreed that all the times during which delay in the completion of said steamer shall be caused by strikes of workmen whether in the works of the Cowles Company or in the works where any of the materials or machinery for said steamer is made or by epidemics or by the elements, or by delays of carriers or by other causes beyond the control, by the exercise of reasonable diligence, of the Cowles Company, shall be added to the time here-

inbefore fixed for the completion of the said steamer and the said time extended accordingly.

In witness whereof the said parties have caused these presents to be signed by their presidents and their corporate seals to be hereunto affixed the day and year first above written.                    The Cowles Engineering Co.,
                                                    By William Cowles, President.

Witness:
    Rufus L. Ogden.

[Seal.]
    Attested:
      Henry Lysholm, Secretary.

[Seal.]                                        The Interstate Steamboat Co.,
                                                    By F. B. Vandergrift, President.

    Attest:
      Edward S. Wyckoff, Secretary.

At the time of entering into this contract the parties agreed that the steamboat company should receive the builders' bond with sureties, in the sum of $25,000, for the latters' faithful performance of their undertaking, and the bond and contract were executed and delivered simultaneously. After the vessel had been partially constructed, and launched, and the steamboat company had paid $42,500 on her, (the full amount due) the builders became financially embarrassed and assigned their property for the benefit of creditors.

In consequence of their failure thereafter to proceed with the work, the steamboat company took possession of the vessel and removed her to this port. Subsequently the assignee sold such interest in her as he might have to the libelant, with notice of the steamboat company's claim to ownership.

He stands, therefore, in the shoes of the builders. If as between the latter and the steamboat company the title was in the builders, he can recover; otherwise he cannot. A different case might, possibly, have arisen if the vessel had been levied upon and sold by creditors, while in the builders' possession.

Looking at the terms of the written contract, alone, and construing them as similar terms have been construed by the courts of this country, I would be constrained to hold that the title was in the builders. See Elliott v. Edwards, 35 N. J. Law, 265; Stevens v. Shippen, 29 N. J. Eq. 602; Merritt v. Johnson, 7 Johns. 473; Andrews v. Durant, 11 N. Y. 35; The Revenue Cutter No. 2, 4 Sawy. 143, [Fed. Cas. No. 11,714]; Clarkson v. Stevens, 106 U. S. 505 [1 Sup. Ct. 200].

These cases decide that payment by installments during the progress of construction does not vest title to a vessel in the party for whom it is built, in advance of delivery. The question is one of intention, and our courts hold that such payment is not, of itself, sufficient evidence of an intention to vest title in the purchaser before delivery. The subject has produced much controversy, and in England the inference from such payment is directly the reverse of that drawn here. See Benj. Sales, p. 246, and the cases there cited. Of course parties may agree for the transfer of title in advance of delivery, and such agreement may be inferred in the absence of positive expression, where the contract and attendant circumstances justify it. I repeat, looking at the terms

of the paper alone, in the light of our decisions, I would be constrained to hold that the title of this vessel remained in the builders. I do not attach importance however to the eighth clause, which the libelant invokes as affirmative evidence in his favor. It provides that the steamboat company may decline to accept possession (which must necessarily remain in the builders) if the latter fail in their contract; and that in such case the former shall be entitled to recover the price paid with interest. This is not inconsistent with an intention that the title should vest in the steamboat company before delivery. Of course on the rejection of possession, and a return of the money, the title would return to the builders—if it had previously passed out. A clause expressly providing that it should vest in the steamboat company would not be inconsistent with the eighth.

The latter would then be held (as it must now) to provide, in effect, for a return of the vessel after trial, and a recovery of the price advanced in place of the remedy by suit for damages.

Nor on the other hand, do I attach importance to the clause providing for a mortgage of the vessel, and the action of the parties under it. The mortgage was to embrace other property of the steamboat company; and as it was to secure a part of the third installment and must therefore be issued when that installment became due, and consequently in advance of completing the work, it was natural to include the unfinished vessel, even though the title had not passed.

The mortgagors had an inchoate title or interest at least; and even if they had not, the mortgage would be as effectual as if executed after the vessel was delivered. The inclusion would avoid the necessity for a second mortgage, and answer the purpose of the parties as well whether the title had passed or not.

The clause is silent as respects the time when the vessel shall be mortgaged. It may well be construed to mean after she is completed. It is true that the acceptance of the mortgage would unexplained, be an acknowledgment of title in the mortgagor, and as against one who had acted on this acknowledgment (as, for instance, purchasers of bonds) would constitute an estoppel. But as between the immediate parties I do not think the matter important.

The case is, therefore, reduced to the following questions:

First: Was there an agreement, (or mutual understanding, which is the same thing) when the paper was signed, that the title should vest in the steamboat company before delivery of possession; and if there was, then, second, may this be shown?

I think it is clear that there was such an agreement. The steamboat company was represented by Mr. Vandergrift and the builders by Mr. Cowles. Each appears to have had full authority in the premises. The question of title arose when the subject of security for advance payments was under consideration. The demand was for $50,000, which Mr. Cowles pronounced unreasonable, because as he stated in effect, the title of the vessel would be in the steamboat company, affording partial security at least, for

the money paid. The final draft of the written contract had not been made. The statement was not a mere expression of Mr. Cowles' understanding of the law, or construction of the proposed paper, which it was understood might or might not be correct. It was the assertion of a fact, based as he declared, on his extensive experience in such business—that the title to vessels in process of construction, as contemplated in this instance, is in the party for whom they are constructed, that the title to this vessel would be so vested, and he therefore proposed that the parties proceed in the matter of making a contract, and taking security, on this basis; and they did so—Mr. Vandergrift accepting and acting upon the statement and proposition. The testimony of Mr. Vandergrift and Mr. Cowles (to be found in the respondent's record at pages 20, 21, 31, 48, 49, 64, 65, 66) is harmonious throughout, and leaves no doubt that it was distinctly agreed that the title should be treated as vesting in the steamboat company from the beginning, if a contract, as proposed, was entered into. The demand for security was consequently reduced $25,000 on this account, and the paper signed. Without this agreement Mr. Vandergrift declares the demand for security would not have been reduced, nor the paper signed. The testimony of Mr. Cowles and the transaction itself, sustain this declaration. It is unreasonable to suppose the steamboat company would otherwise have bound itself, for the advancement of nearly $50,000 on security for its return in only $25,000—in case the builders failed. I have called this an agreement, rather than an understanding, because a mutual understanding between contracting parties is an agreement, and properly is so designated. The following language taken from the libelant's brief ("Supplementary Points," p. 5) substantially admits the agreement:

"It is quite possible that Cowles, as ignorant of the law applicable to such contracts as the parties whom he assumed to advise, did in good faith, express the opinion that no such express clause was necessary. And if the respondents had been willing to take the contract as it then stood they might have been entitled in their present predicament * * * to sympathy."

It is supposed, however, that they cannot have anything more than sympathy because they executed the paper without requiring the agreement to be inserted, and because the eighth clause which was subsequently added, shows that the agreement was abandoned. This clause however, as we have seen, does not touch the question of title; and as the testimony plainly shows was not intended to affect it.

We are thus brought to the question: Does the execution of the paper preclude proof of the agreement? Counsel have urged with great earnestness and ability that it does, because such proof would contradict the paper. I am not able to adopt this view. The paper is silent on the subject. It provides, simply, for building the vessel described within a specified period, and paying for it in a specified manner, with privilege in the steamboat company to refuse possession and recover the price paid if the builders fail in duty. There is no mention of title or allusion to the sub-

ject. It is left entirely to inference. Without more (as stated) the court would infer intention to leave it in the builders, because the contrary is not expressed. If the paper had said it shall vest in the steamboat company it would of course have so vested, and this would not have been inconsistent with any other provision. It would simply have repelled an inference, otherwise arising from its absence. If it had been reduced to writing separately this writing would certainly be admissible as collateral to, and consistent with the terms of the paper. It would no more contradict it than it would if inserted therein. Suppose the parties had written: "It is agreed (or understood) that title to the vessel shall (or will) vest in the steamboat company during the process of construction, and consequently security for advancements on account of price is fixed at $25,000, and the contract will be signed," or had written: "It is understood, in entering upon the contract about to be executed, that title to the vessel shall vest in the steamboat company when work commences;" could it reasonably be contended that the writing would not be admissible. That the agreement was left in parol is unimportant. A parol agreement collateral to a written one whose terms it does not contradict or vary, is as admissible as one reduced to writing. I find no difficulty therefore in admitting the evidence on this ground. Walker v. France, 112 Pa. St. 203, 5 Atl. 208; Cullmans v. Lindsay, 114 Pa. St. 166 [6 Atl. 332]; Chapin v. Dobson, 78 N. Y. 75; Bank v. Fordyce, 9 Pa. St. 275; Chalfant v. Williams, 35 Pa. St. 212; Steamboat Co. v. Brown, 54 Pa. St. 77; Chew v. Gillespie, 56 Pa. St. 308; Martin v. Berens, 67 Pa. St. 459; Graver v. Scott, 80 Pa. St. 88; Kostenbader v. Peters, Id. 438; Driesbach v. Bridge Co., *81 Pa. St. 177; Whitney v. Shippen, 89 Pa. St. 22; Jessop v. Ivory, 158 Pa. St. 71 [27 Atl. 840]; 1 Greenl. Ev. pt. 2, c. 5, §§ 296, 304.

Would it not be admissible, on another ground, even if it contradicted the terms of the paper? As we have seen the paper and bond were executed contemporaneously, and formed one transaction. The arrangement for contructing the vessel, paying for it, and securing a return of the price in case the builders fail, constitutes a single contract, and it is clear that the steamboat company's consent to this contract, and acceptance of the bond in $25,000, were procured by the assurances and on the agreement before stated. Mr. Vandergrift says distinctly that he would not have signed the paper, or accepted the bond without it, and as before remarked Mr. Cowles' testimony, and the original demand of security in $50,000, sustain his statement. The object of the security was to provide for the contingency which has occurred— the builders' failure to keep their contract. By means of the agreement and understanding, induced by Mr. Cowles, the paper was procured, binding the steamboat company to advance $42,500, on a bond for $25,000, which must now prove wholly inadequate to protect the company against loss, if the agreement may be repudiated. To allow such repudiation would be to allow the perpetration of a fraud. The intention to repudiate now manifested would relate back to the date of the contract, constitute a fraud

in its procurement, and thus justify its reformation.  Caley v. Railroad Co., 80 Pa. St. 363; Miller v. Railroad Co., 87 Pa. St. 95; Hoffman v. Railroad Co., 157 Pa. St. 174 [27 Atl. 564]; Reilly v. Daly, 159 Pa. St. 605 [28 Atl. 493]; Cullmans v. Lindsay (Pa. Sup.) 6 Atl. 332; Cake v. Bank, 116 Pa. St. 264 [9 Atl. 302]; Jackson v. Payne, 114 Pa. St. 67 [6 Atl. 340]; Thomas v. Loose, 114 Pa. St. 35 [6 Atl. 326]; Phillips v. Meily, 106 Pa. St. 536; Graver v. Scott, 80 Pa. St. 88; Renshaw v. Gans, 7 Pa. St. 118; Rearich v. Swinehart, 11 Pa. St. 240.

It is asserted that the doctrine of these cases is not that of the common law, as administered in the federal courts; but no authority for this is cited; and none is known to me.

It is urged that Cowles did not represent his company in this respect.  If he did not, the company took the benefit of his acts —the contract and the $42,500, paid under it, obtained on the faith of them; and it cannot therefore deny his authority.  If he failed to inform his principal he may have failed in his duty to it; but the steamboat company is not responsible for this, and must not suffer from it.  The contract and reduction of security were the fruit of the oral agreement which he induced, and his company cannot take the fruit and withhold the price.  There is no hardship, whatever, in applying this familiar rule to the company.  They could lose nothing whatever by such vesting of the title.  They had no interest in retaining it; their lien afforded all the security the title could possibly confer; while to the steamboat company its possession was vital—with their security for advancements reduced to $25,000.  The amount of reduction must now be lost if the company can take the benefits of the contract and repudiate the authority of its agent.

While I am impressed with the belief that the evidence is admissible also on the ground of mutual mistake—if held to conflict with the paper—it is unnecessary to consider this question, and I will not, therefore, do so.

I intended to say in the proper place, but did not: that I attach no importance to the builders' insurance of the vessel.  It does not tend to shed light even on their understanding of the contract at that time.  Their lien called for insurance as clearly as possession of the title would.

A decree must be entered dismissing the libel with costs.