## In re MacDONALD.

### (District Court, D. Connecticut. May 11, 1905.)

### No. 1,432.

BANKRUPTCY—PROPERTY VESTING IN TRUSTEE—UNCOMPLETED VESSELS IN SHIPYARD.

The bankrupt at the time of his bankruptcy was conducting a shipyard, and had contracted with the several petitioners to build vessels for them; the contracts providing for the making of partial payments by them at certain stages in the progress of the work, and that title should vest as each payment was made. At the time of the bankruptcy one of said vessels had been practically completed, so far as the work of the bankrupt was concerned, the payments had been made, and it had been launched and delivered to the petitioner for whom it was built, who was to complete it himself. The others remained in the yard in various stages of construction, but the required payments had been made, and exceeded the value of the structures. None of such vessels were scheduled by the bankrupt, but all were taken possession of by the trustee, who declined to complete the contracts. *Held*, that the title to such vessels, so far as completed, was in the several petitioners, who were entitled to their possession.

In Bankruptcy. On report of special master in the matter of several petitions for possession of personal property in the hands of the trustee.

### Petition for Possession of Schooner George F. Scannell.

To the Honorable James P. Platt, Judge of the District Court of the United States for the District of Connecticut: The petition of Edward H. Jones, master, in behalf of the owners of the schooner George F. Scannell, respectfully shows:

First. That on the 7th day of December, A. D. 1903, he entered into a contract with M. B. MacDonald, the bankrupt herein, for the building of a four-masted schooner for himself and other co-owners, the original copy of which contract the petitioner will exhibit in court upon the hearing of this petition. That said contract, after setting out the specifications for said schooner, says the following about terms of payment, and the vesting of the title after said payments:

"Five Hundred Dollars upon the execution of the Contract ($500).

"Thirty-five Hundred (3500) dollars when the keel is laid, and frame is in the yard.

"Five thousand (5000) dollars, when frame is up.

"Five thousand (5000) dollars, when ceiled.

"Five thousand (5000) dollars when planked.

"Four thousand (4000) dollars when nearly ready to launch.

"Four thousand (4000) dollars when the vessel is completed and delivered over to the party of the second part.

"It is also further agreed, that as each payment is made under this contract, title to the amount thereof, shall vest in the subscribing owners, and be protected by insurance at the expense of the party of the first part and made payable in case of loss to the party of the second part.

"Executed in the presence of         M. B. MacDonald
   "Geo. A. Tooker.               Edward H. Jones."

Second. That, according to the terms of said contract, upon each payment being made the title of the schooner, in her then process of construction, vested in your petitioner and his co-owners, and never in any manner did it vest or ever was it in M. B. MacDonald, the bankrupt herein.

Third. That, according to the terms of said contract, your petitioner made the payments to said M. B. MacDonald as specified in said contract, and that

said schooner was launched and turned over to your petitioner, according to the terms of said contract, by M. B. MacDonald, the builder, and bankrupt herein, on the 31st day of December, A. D. 1904.

Fourth. That your petitioner, after the vessel was launched and formally turned over to him on January 3, 1905, had the same enrolled and numbered in the customhouse at Stonington, as required by the laws of the United States, which enrollment the petitioner will exhibit in court upon the hearing of this petition.

Fifth. That thereafter and recently the said M. B. MacDonald filed with the clerk of the District Court of the United States for the District of Connecticut a petition, with proper schedules, duly verified, by which he prayed that he might be adjudicated a bankrupt, as provided by the bankruptcy act and any amendments supplementary thereto or amendatory thereof, and did not include in said schedules, as property belonging to him, the said schooner George F. Scannell.

Sixth. That thereafter, and on the 23d day of February, 1905, one Amos R. Chapman, of Mystic, Connecticut, was duly appointed trustee of the goods, chattels, and credits belonging to the said bankrupt, and did duly qualify as such trustee by giving the bond required by law, and that said trustee has caused the schooner George F. Scannell to be appraised as the property of M. B. MacDonald. That said trustee has wrongfully, unlawfully, and illegally taken possession of the said schooner, and unlawfully withheld her from your petitioner, and, in violation of law, and in furtherance of his unlawful seizure of said schooner, has placed a keeper on board of her.

Seventh. That your petitioner has informed the said trustee, Amos R. Chapman, verbally and by letter from his attorney, that said schooner George F. Scannell was not the property of M. B. MacDonald, the bankrupt herein, and never had been—she having been built under a contract which, upon each payment being made, vested the title of said schooner, in her then condition, in the subscribing owners—and has offered to exhibit said contract to the trustee; but the said trustee, ignoring the contract, and in violation of law, refused and still refuses to allow your petitioner to remove said schooner from the place where she is now lying, and, because of such action by the trustee, your petitioner has been unable to do anything towards finishing said schooner and getting her ready for sea.

Eighth. That the said schooner George F. Scannell is now lying at the dock in MacDonald's Shipyard, in Mystic, Connecticut, and is a valuable, four-masted schooner, of the following dimensions: Length of keel, 160 feet; beam, 37 feet; depth of hold, about 13½ feet; and estimated to cost, when completed, about $41,000. That said schooner is now all completed, with the exception of a little work on her cabin, trunneling, and rigging, and can be made ready for sea in about one month. That a fair and reasonable demurrage for said schooner is $75 a day.

Wherefore your petitioner demands judgment against said bankrupt and his trustee, Amos R. Chapman, for the possession of said schooner George F. Scannell, and the return thereof to the said petitioner, together with damages in the sum of $3,000 for the unlawful detention and possession of said schooner, together with the costs of this proceeding, and for such other and further or different relief as the court may deem just and proper.

James D. Dewell, Jr.,
Attorney for Petitioner.

The remaining petitions, and the contracts therein set out, were in substance the same as the foregoing, with the exception noted by the master in the case of George W. Frost.

### Report of Special Master.

To the Hon. James P. Platt, Judge of said Court: The undersigned, having been appointed special master by this court, by order dated March 20, 1905, upon the petitions of four several claimants of four several schooners and keels, etc., schooners in process of completion by said bankrupt at the time he was adjudicated a bankrupt, and now in the possession of Amos R. Chapman, of Mystic, as the trustee in bankruptcy of said bankrupt, and

praying for the delivery of the same to the petitioners, to take proofs as to the facts alleged in said petitions, and report such proofs and his opinion thereon at a day not later than the 3d day of April, A. D. 1905, and having proceeded to act upon said appointment, would respectfully report:

That on said 20th day of March, 1905, he issued a citation to the said trustee, citing him to appear in his office in Hartford to file his answers and make his proofs in said matter, and sent said citation, with copies of said several petitions, and of the orders of court thereon, duly attested by the certificate and seal of the clerk of court, by registered mail, to the said trustee, which was thereafter, on the 24th day of March, A. D. 1905, duly received and receipted for by the said trustee. That thereafter, on the 27th day of March, A. D. 1905, the said trustee appeared before the master at his office in Hartford, with counsel and witnesses, and filed answers to said several petitions, and the parties were at issue upon said several petitions, as by said petitions, and the respective answers thereto, herewith returned, appears. And thereupon and thereafter on said day and March 29th and March 31st the parties were fully heard by their witnesses and counsel, and the proofs of the parties, the testimony of their witnesses duly sworn before the master, and the exhibits offered by them were duly considered, and herewith returned with the master's notes of the evidence given.

From such proofs taken, with records in bankruptcy previously filed in this court, I find that said Michael B. MacDonald was a shipbuilder residing in Mystic, Conn., and having a shipyard in Mystic, on Mystic river, above the railroad bridge, where he had for some years constructed vessels; employing at the time of his bankruptcy, February 3, 1905, about 100 workmen. The name M. B. MacDonald & Sons appeared on the principal shop or building in the shipyard, and such name was printed on some of the letter heads used by him, and three of his sons appear in the list of employés; but the proof was that they had no interest in the concern save their wages, and that the bankrupt was the sole proprietor. He gave mortgage security for his debts, commencing in 1900, and afterwards in 1902 and 1903, so that at the time of his bankruptcy he owed $9,900 on mortgage, but it does not appear definitely when he became insolvent or of shaky credit. It does appear that his financial standing was such at the time of the making of the Gilbert, Davis, and Jones contracts for shipbuilding, upon which these petitions were based, he did give a guaranty to the contractors that he would complete the vessels according to contract, and with all of them he agreed that title to the work, as fast as paid for under the contracts, should vest in the contractors. Such precautions to secure business and the safety of the contractors did not indicate full confidence on the part of the contractors in his financial ability to build and complete as he contracted.

As to the contracts of Davis, Gilbert, and Jones, the agreement that the title of the work should be in the contractors as fast as paid is in black and white. As to the Frost contract, it does not appear. But it does appear that the minds of MacDonald and Frost did meet on that point, as a definite condition of the contract, and Frost set about getting up such a contract. He had seen and read the Davis contract for the schooner C. E. Wilbur, and such a contract for his schooner he and MacDonald agreed to. Frost went to Davis to get it, or a copy, as a form for his own. Davis let him have a copy, but, being unwilling to have his contract prices made known, he tore off the final sheet or sheets, as this was the part which contained the contract as to the vesting of title to the work so far as paid for. Otherwise the specifications were quite similar, only Frost's was to be "baldheaded," while the Wilbur was to carry topsails. He took the abbreviated form of contract to his ship agents in Boston (John S. Emery & Co.) for a pattern for his projected schooner, and consulted them, and obtained their approval of the form; and they drafted a form of a contract from it and sent it to him within three days thereafter. This he took to MacDonald, and they executed it; both understanding and believing it was similar to the contract for the Wilbur, and that it contained a provision that the title to the schooner to be constructed should, proportionately as each payment was made, vest in the contractors in the same proportion as such payment was to the total of payments to be made.

138 F.—30

MacDonald told Frost that the title was in him as fast as payments were made, and both believed it, until later investigation shows that the matter on the final sheet of the Davis contract did not get into the Frost contract at all. Great carelessness is evident. If the actual contract can be supplemented by proof of intention of this further condition, I find such intention of the contracting parties proved.

It is claimed on the part of the trustee that, by the Connecticut decisions, the possession of personal property on the part of the vendor, after payment, is colorable and fraudulent as to creditors, and the claim is correct as to movable chattels; also that no title could pass or did pass to these vessels so long as they were in the possession of MacDonald, although paid for, so far as creditors are concerned, and that all these contracts were fraudulent as to them—and cite in support of their various contentions Williams v. Jackman, 16 Gray, 514; The Revenue Cutter No. 2, Fed. Cas. No. 11,714; Clarkson v. Stevens, 105 U. S. 505, 27 L. Ed. 139; Shaw v. Smith, 48·Conn. 306, 40 Am. Rep. 170; In re Wilcox & Howe, 70 Conn. 220, 39 Atl. 163; Newtown Savings Bank v. Lawrence, 71 Conn. 358, 41 Atl. 1054, 42 Atl. 225; and many other cases. The petitioners rely mainly on the case of The Poconoket (D. C.) 67 Fed. 262, and same on appeal in 70 Fed. 640, 17 C. C. A. 309.

It is evident that vessels in process of construction, prior to launching, cannot be physically delivered, and that if one is being built for any contractor, and the work and materials put on her are being paid for by the contractor as fast as or faster than put on, and the contract is publicly made that the title shall vest in the contractor, to that extent it is a fraud upon no one. In all these cases contracts were made or attempted to be made for such purpose. So far as appears, MacDonald was, at the time these contracts were made, obtaining no work, except upon such contracts. Contracts purporting to give employment to a skillful mechanic and shipbuilder, having insufficient capital to carry out such contract on his own credit, and thereby giving him and his plant and a hundred or more employés employment, and permitting contractors to avail themselves of his skill as a shipbuilder, could not, certainly, be considered as against public policy. It would seem that the law should as fully protect the property and materials put upon an immovable chattel by a shipbuilder, and paid for, as that put upon a house by a carpenter. That such contracts are good is the law of The Poconoket, heretofore cited, as I understand it. The trustee declines to complete these contracts.

The four contractors, who are petitioners, allege, in substance, as follows:

Cornelius A. Davis, of Somerset, Mass., a shipwright and builder, made an agreement with MacDonald on or about April 4, 1904, to furnish all the materials to build and launch a four-masted schooner, all for $27,000, to be paid for as per contract; title to vessel to amount of each payment to vest in Davis as paid.

Davis paid April 18, 1904................................................. $1,000
    "        "    July 11,   "    ......................................... 3,000
    "        "    Nov.  4,   "    ......................................... 4,000
    "        "    Dec. 23,   "    ......................................... 4,000

The schooner was ceiled at that time, being the stage of construction calling for that payment in the contract.

MacDonald went into bankruptcy February 3, 1905, and did not include the schooner in the schedules. Amos R. Chapman was appointed trustee about February 23, 1905, and took possession of the shipyard and schooner, and has refused to give it up. Value, according to appraisal, $9,330.82. MacDonald's work on her ceased about the 1st of January.

In this case I find that the possession of the schooner should be delivered to Davis, with whatever rights to complete her where she lies as the bankruptcy court has power to give the trustee, and that the modifications of the contract placed thereon by the parties December 23, 1904, is immaterial to Davis' right of possession.

(2) Edward H. Jones, master for owners of the schooner George F. Scannell, made an arrangement with MacDonald to build the schooner for himself and other co-owners. This agreement was made December 7, 1903, and called for $27,000 at various stages of the work, and Jones made all these payments

as agreed, and on December 31, 1904, the Scannell was launched and turned over to him; and he had her enrolled in the customhouse at Stonington, as required by law, January 3, 1905, and she was taken to Cottrell's dock, where she was attached later by one of Mr. MacDonald's creditors. MacDonald did not schedule her in his bankrupt schedules, but Chapman, trustee, February 28, 1905, took possession of her, and still holds the possession of her. She is nearly completed, and will be worth about $41,000. The petitioner wants possession, and $2,000 demurrage—$75 per day. The trustee has put a keeper on board, had her appraised as the assets of MacDonald, and is using up her value in keeperage, etc.

(3) George W. Frost, of Central Falls, R. I., made a contract with MacDonald to build a four-masted schooner, April 30, 1904, for $38,400, to be completed January 1, 1905, and to be paid for in stages; title to vest with each payment. He has paid $19,960. She was not scheduled by the bankrupt, but has been inventoried and appraised by the trustee, who holds possession, and is worth from $8,000 to $9,000 in the present, incomplete state, as appraised. Frost prays for possession and damages and costs.

(4) Mark L. Gilbert, of Mystic, claims that on May 23, 1904, he made an agreement with MacDonald whereby MacDonald was to build and launch the hull of a four-masted schooner on the 1st day of March, 1905, for $23,250, to be paid for in stated sums at various stages of construction, with title to the amount paid for to vest in said Gilbert upon each payment, and that he has paid $3,250 upon said construction, and is entitled to the keel and frames that have been set up and prepared. The trustee has taken possession of the same, and has destroyed the construction in part by using 13 of the frames in the Boggs, another schooner in course of building in the same yard. Appraised value of the keel, etc., $310.10. He prays for possession of so much as is left, and for damages for the destruction of the 13 frames misapplied. As to the Jones schooner, MacDonald's contract only extended to completing the schooner to an extent sufficient to launch; Jones himself to do the rest, amounting to several thousands of dollars—$11,000 or $12,000. That she was so far completed as to be fit to be launched at the time she was launched and delivered is affirmed on one side, and denied on the other. Jones had anticipated getting her launched and away from the shipyard before winter set in—as early as midsummer—and had then obtained permission to take her into Cottrell's dock, where she now lies. She was liable to be frozen in if she remained at the shipyard till winter, and in fact it appears in the evidence that she had to be cut out to some extent when she was launched and taken away, and it was necessary she should be where she could be got out readily, so that Jones could do his completing work, which would require a month or so after MacDonald had completed his part. The title delivery was December 28th, by builder's certificate, etc.; the physical, December 31st, when MacDonald tied her to Cottrell's dock at Jones' request. It is true, there were many ceiling bolts to be driven upon her, also many keelson bolts, and many other minor matters, but the weight of evidence was that she was "fit to launch," which seems to be amply supported by the fact that she has been afloat three months and more without pumping at this time. There is evidence in the case that Frank MacDonald, one of MacDonald's sons, and bookkeeper for him, about the time of the launch, interviewed Mr. Crandall, the draw tender on the railroad bridge, to ascertain whether or not it would be opened in the nighttime, on application, for the passage of towboat and tow, and, after ascertaining that it would, went on the same night to intercept Jones, at New London, and Tooker, an agent of Miller & Houghton, ship agents, of New York, who were acting as agents for the schooner's owners—said Jones and Tooker being then on their way to New Haven to consult their proctor as to future proceedings—and then and there informed them of the fact. Whatever plot or design on the part of Jones, Tooker, or Frank MacDonald this information was obtained to assist or develop, it evidently did not develop, for the next day the boat, in obedience of a telegraph or telephone from Jones, at New York or New Haven, was launched by MacDonald, and taken across the river, some five minutes' walk, to Cottrell's wharf, and tied up, as had been arranged for by Jones the summer before. If any scheme had been at any time exploited or devised by

Tooker or any one to run off the schooner by stealth out of the reach of MacDonald's creditors, in contemplation of bankruptcy, it was summarily dropped and utterly abandoned. She was attached January 7, 1905, on the suit of Standard Machine Co. v. MacDonald; but subsequently the trustee in bankruptcy took possession of her, and had her appraised at $23,500, and she is still in his possession. She is not worth as much as has been paid for her, and the trustee has no interest in her for labor or materials, and she should be returned to Mr. Jones at once, lest further loss occur to her owners through the law's delays.

As to the Frost petition, I have heretofore stated the proofs and my opinion. I find that the boat, in her present stage—keel and frame, etc.—should be delivered to Frost, and such time for completion should be given or leased to her owners, consistent with their rights and the rights of creditors under the bankrupt law, considering that the bankrupt is as entirely bankrupt as to his contracts and engagements as he is as to his debts, and that neither he nor his trustee can be compelled to fulfill his engagements of either sort.

As to Gilbert's claim, his contract was' for a four-masted schooner, made May 23, 1904, with payments stated in the contract at different stages; title to the vessel to be in him as fast as payments were made. He paid $100 at the time the contract was signed, and again $3,150 at the time MacDonald informed him that the keel was laid and the frames were in the yard. If there had been any frames molded and designated for this schooner, they cannot be found in the yard now; and there is evidence showing most of the molded frames, which lay about the yard in undistinguished piles, have gone into a certain schooner, called the "Boggs," which is in the stocks or frames in the yard, awaiting completion. The keel has been appraised at $310.10, and its whereabouts is known and designated, and should be delivered to Gilbert, and all such rights and conveyances for completing her be leased to Gilbert as is possible under the bankrupt law; and by so doing he may decrease the obligations of the estate to the guarantors of MacDonald upon the contract, who have probably a provable claim against him for so much as they shall lose by his nonfulfillment of the contract, at least to the extent of the payments he has received thereon, over and above the value of the work done as appraised.

I find that the court has full power to supervise and revise the proceeding of the referee and trustee in all such matters, when brought to its attention, in the most summary and informal manner, as in this case, certainly if they appear and are heard thereon.

Samuel Park and James D. Dewell, Jr., for petitioners.
H. A. Hull and H. W. Rathbun, for trustee.

PLATT, District Judge. Upon adjudication, the trustee took title to all property which was then vested in the bankrupt, subject to all valid claims, liens, and equities. The title to the property which the petitioners ask to reclaim was, as appears by the evidence and the report of the special master, vested in them, and not in the bankrupt. Such vesting was based upon contract, and full value for the interests vested had been paid.

The case of the Scannell is a clear one, because physical delivery of possession had been added to the actual title. As to the other contracts, it would be a queer proceeding for a court, which in such matters as this is understood to invoke and apply the pure principles of equity, to deprive the petitioners of the benefit of deliberate contracts, made with an open eye and for good reason, and in the same breath turn over to the general mass of creditors uncompleted parts of certain things, which the trustee is unable and unwilling to so treat as to give them hereafter a substantial value. The Poconoket Case (D. C.) 67 Fed. 265, is not exactly in point, it

is true, but that Judge Butler was not much impressed with the possibility of change which the facts of this case present is also quite evident.

It is not apparent that the fact that creditors herein attempted to assert claimed rights adds anything to the force of the reasoning presented by counsel for the trustee and those particular creditors.

The report of the special master is confirmed, and let the properties in question be delivered to the petitioners in accordance therewith, but without costs or disbursements or demurrage in the case of the Scannell, the said properties having come to the possession of the trustee by process of law, and not by effective action on his part.