WILFRED *et al. v.* MYERS *et al.*

*(District Court, E. D. Virginia.* October 24, 1889.)

SHIPPING—AGREEMENT TO CHARTER—WARRANTY.

Brokers tendered to defendants a vessel for charter of a certain registered tonnage. Defendants, being unable to find the cubical capacity of the vessel described in any of the published ratings of vessels at that port, made inquiry of the brokers, who informed them that it was a certain amount, and defendants then agreed to accept it. A charter-party was drawn up, in which defendants inserted the represented cubical capacity, but the brokers gave notice that they had no authority to guaranty cubical capacity, and it was agreed to send the charter-party to the vessel's agents, who, on receipt of it, declined to guaranty the capacity. *Held,* that there was no contract, as the representation made by the brokers as to the capacity was, under the circumstances, a part of the contract on the part of the defendants, whatever it may have been on the part of the brokers.

In Admiralty. Libel for breach of contract to charter.

This is a libel *in personam* for damages and expenses resulting from the breach of an alleged contract for the charter of the English steam-ship Netherholm for a shipment of cotton from Norfolk to Liverpool. Bowring & Archbold, of New York, and Lamb & Co., of Norfolk, were the brokers of the libelants in the transaction upon which the libel is founded. The leading facts of the case seem to be as follows: On inquiry from Myers, one of the respondents, about 9 o'clock A. M. on the 11th of October, 1888, at Norfolk, Page, a member of the firm of Lamb & Co., stated that his firm had in hand that morning two ships for charter, one of them being the first-class new English steamer Netherholm, which would be due at Norfolk on the 1st November, rated at 1,295 tons registered capacity and 2,900 tons dead weight, which he would charter at 62s. 6d. per registered ton. At Myers' request an option on this ship was given until 11 o'clock that day. The price was the highest that had been given that season, and is about as high as is ever given in Norfolk. Myers found on going to his office that the Netherholm was not described in any of the books in which the capacity, dimensions, and character of ships are published. The registered tonnage of a ship is determined by arbitrary rules of measurement that do not afford accurate information of her cubical and carrying capacity. The Netherholm had never been loaded at Norfolk. It resulted from these circumstances that Myers, on going to his office, found no *data* to guide him to a knowledge or safe conjecture of the actual cubical capacity of the Netherholm; and he was put upon inquiry of Page as to her real capacity. Page received from the New York house that morning a telegram stating the cubical capacity of the Netherholm to be about 141,356 feet, and communicated the fact to Myers in a personal interview at the office of Myers & Co., about 11 o'clock. Vessels differ considerably in their cubical capacity, compared with their nominal registered tonnage. Some of them have as little as 80 cubic feet to the registered ton, while others have more than a hundred. When Myers and his partner were informed that the Netherholm had a cubical capacity of 141,356 feet, which was nearly 110 cubic feet to the ton, and which (estimating 22 feet as the cubical dimensions of a bale of cotton) made the Netherholm a vessel which would

carry five bales to the registered ton, whereas most vessels carry less, some of them not more than four bales to the ton, they agreed to take this ship at the unusually high price of 62s. 6d. per registered ton; whereupon Page returned to his office, and prepared a charter-party, which he sent to the office of Myers & Co. Later in the day Myers returned to his office, and found there the charter-party, which had been sent for his signature. On reading it he discovered that it contained no mention of the cubical capacity of the Netherholm. He thereupon inserted in the paper the phrase, "Owners guaranty steamer's capacity for cargo, 141,356 cubic feet," signed the charter-party, and returned it to Lamb & Co. At a conference soon held between Page and himself, Page insisted that his correspondents in New York would not guaranty the capacity to be 141,356, and that he had stated the capacity to be about that figure. Myers then inserted the word "about" in the phrase, but afterwards erased it. Page expressed the belief that the New York firm would not sign the charter with those words in, as they had not authorized him to guaranty. It was agreed between them that the charter should be sent to the house in New York with the phrase in it, and also with a clause allowing the ship to receive cargo at the adjacent port of Newport News. The charter-party was sent to New York in the form thus described. On the next day, the 12th October, Page received a telegram from the New York house, stating that the paper was not in proper form, and that Lamb & Co. were not authorized to guaranty cubic capacity. This was promptly shown to Myers, who at once replied that he had consented to take the vessel on the faith that her cubical capacity was what had been stated, and that their representation of the capacity could not have been made for any other purpose than to enable him to determine whether to take her or not. The New York house also required that the charter-party should declare that the ship had sailed on the 6th October from Mayport, England, for Halifax and Bridgewater, and should not stipulate that she was due at Norfolk on the 1st November, as had been written in the charter. Myers refused to consent to the cancellation of the phrase guarantying the cubical capacity of the ship, and little was said of the clauses relating to Newport News, and to the ship being due at Norfolk on the 1st of November. The New York house, Bowring & Archbold, had not in their telegram of the 12th to Lamb & Co. either expressly affirmed or disaffirmed the charter-party, unless their refusal to guaranty the ship's cubical capacity was a disaffirmance. Then followed attempts between Page and Myers to reach a compromise, which were continued until the 16th October, orally and by letters. I do not think that these negotiations materially change the character of the transaction which I have set forth. On the 16th, Bowring & Archbold telegraphed that the owners of the Netherholm declined any compromise whatever, and insisted upon the charter being carried out as verbally arranged with Lamb & Co., before the charter was signed. This telegram was apparently intended as responsive to the last sentence of a letter from Myers & Co. to Lamb & Co., of the 13th, in which they had said:

"The situation then appears to be that no completed contract exists between us, inasmuch as Messrs Bowring & Archbold, acting for the owners, have repudiated a charter which no one can deny contained the essential features of the proposition made by you to us, viz., to charter S. S. Netherholm, 141,356 cubic feet cargo capacity, for 62s. 6d. per ton register; which proposition they claim was not authorized in one of its most essential features; and you have tendered us, under their instructions, a contract which we will not accept because it does not embody what you proposed on the day you first offered us the vessel."

In reply to the peremptory telegram of the 16th, from Bowring & Archbold, Myers & Co. telegraphed on the same day, as follows:

"Charter, as originally drawn, which you have repudiated and declare unauthorized, was in accordance with the original proposition. You having repudiated it, we consider negotiations between us at an end."

It may be added that, among other things that transpired after the 16th October, was the fact that freights about that date took a decided decline; that Lamb & Co. chartered the Netherholm to another Norfolk shipping firm at 57s. 6d.; that on the 18th the owners of the ship offered to allow the insertion of the clause guarantying the ship's cubical capacity; and that Myers & Co. declined then to accept the charter, in consequence of having engaged their freights to other steamers.

It was shown in evidence that it is quite unusual for charter-parties entered into in Norfolk to contain a guaranty of cubical capacity; and respondent Myers testified that this fact results from the concurrent fact that the cubical capacity of almost all ships loaded at Norfolk is known either by their having been loaded before at this port, or that almost all of the ships that apply for cargoes for European ports are described, as to their measurement, tonnage, and cubical capacity, in books published for the purpose of giving this information to shippers and charterers. The damages claimed by libelants in this suit are the difference between the freight money which they received at the rate of 57s. 6d. per registered tonnage, and what they would have received at the rate of 62s. 6d., with their expenses; aggregating about $1,640. In passing upon this case I have not the aid of any written brief from counsel for the libelants, and do not recollect that in their oral argument any authorities were cited in support of the propositions for which they contended.

*Walke & Old*, for libelants.

*Sharp & Hughes*, for respondents.

HUGHES, J., (*after stating the facts as above.*) It is a matter of doubt from the evidence in this case whether Lamb & Co. had any authority to make a complete and final contract for the charter of this ship. Their function would seem to have been merely to find a customer, and to state to him the terms of charter; all besides depending for validity upon ratification by Bowring & Archbold in New York. If they had authority to contract at all, and if the letters and telegrams of Bowring & Archbold are to be regarded as defining that authority, it was merely to charter the first-class new steamer Netherholm, bound at that time to Halifax and Bridgewater, registered tonnage, 1,295, dead-weight, 2,900, for 62s.

6d. per ton registered. The entire contention of the libelants rests upon the assumption that this was the only contract that Lamb & Co. had authority to make, and that Myers & Co. knew this from custom or otherwise; and, having made some contract with Lamb & Co., this and nothing else was the contract that was made. It was evidently on a different basis that Myers & Co. proceeded in the negotiation. Page was made to know from the commencement of the negotiation that the acceptance of the ship by Myers & Co. at the high rate charged depended upon her cubical capacity. This was not known to Myers & Co., and no source was open to them from which they could obtain the information, except Lamb & Co. This firm could have informed Myers & Co. that the capacity was 141,356 for no other purpose than to aid them in making up their minds whether to take the ship or not. It was not meaningless, objectless talk. It was a piece of information known to themselves, which Myers & Co. were casting about to obtain, and which Myers & Co. could not obtain except from them. It was the inducement, or a chief inducement, to taking the ship. Nor was it until the cubical capacity was given, that Myers & Co. declared that they would take the ship. Lamb & Co.'s statement of the ship's capacity, under the conditions and circumstances existing at the time of the statement, made it a part of the contract on the part of Myers & Co., whatever it might have been on the part of Lamb & Co. A warranty or guaranty may enter into a contract without express words to that effect or even the intention of the person who makes the representation which constitutes it. What, then, was the result of this negotiation at the hour of 11 o'clock on the morning of the 11th October? Myers & Co. contracted on the inducement of the ship's capacity being 141,356 cubic feet. Lamb & Co. contracted on the basis that the capacity was not guarantied. Their minds did not meet, for the law makes the statement of the cubical capacity, under such circumstances, a warranty. When the charter came afterwards to Myers & Co. for signature, this discordance of minds immediately developed itself. Myers inserted the cubical capacity clause; Page objected to it. Their minds had not met. When the charter subsequently went to New York, and the house there "repudiated" the capacity clause, it was thereby still further shown that the minds of the contracting parties had not met, and were at hopeless variance. There had been no contract. Nothing is more true in the transactions of business men than that "it takes two to make a bargain." It is elementary law that there shall be a meeting of minds—a mutual agreement—upon all its material terms and provisions, in order to constitute a contract. If a firm in New York sends orders to Norfolk that a ship shall be chartered as they prescribe, and not otherwise, sending also her cubical capacity; and negotiations are made in which the other party declares, "I will take the ship on your statement of her cubical capacity, which I have no other means of ascertaining except from you;" and the firm in New York afterwards withdraws the statement, and insists upon its obliteration,—then there is no contract. Such was the case at bar, and decree must be for respondents.

On the subject of warranty, where it is not expressed in the contract,

and arises necessarily out of the representations of parties, made during the negotiation of the contract, the authorities sustaining my view of this case are very numerous. See Whart. Ag. §§ 72, 158, 161, 167, 168, 170, 708; 1 Add. Cont. § 65; *Schuchardt* v. *Allens*, 1 Wall. 369; Pol. Cont. 527, 528; *Insurance Co.* v. *Kasey*, 25 Grat. 270; *Grim* v. *Byrd*, 32 Grat. 300; *Veazie* v. *Williams*, 8 How. 134; *Crump* v. *Mining Co.*, 7 Grat. 352; *Norrington* v. *Wright*, 115 U. S. 188, 6 Sup. Ct. Rep. 12; *Bannerman* v. *White*, 10 C. B. (N. S.) 844; 2 Add. Cont. §§ 625, 626; *Smith* v. *Richards*, 13 Pet. 26, 38, 42; Carv. Carr. by Sea, 133–136; *Cave* v. *Coleman*, 3 Man. & R. 2; *Salmon* v. *Ward*, 2 Car. & P. 211; *Wood* v. *Smith*, 4 Car. & P. 45; 1 Evans, Ag. 76, 77; *Bristow* v. *Whitmore*, 9 H. L. Cas. 404; *Behn* v. *Burness*, 3 Best & S. 751; *Lowber* v. *Bangs*, 2 Wall. 736, 737; *Glaholm* v. *Hays*, 2 Man. & G. 257; *Ollive* v. *Booker*, 1 Exch. 416; *McAndrew* v. *Adams*, 1 Bing. N. C. 29; *Davison* v. *Von Lingen*, 113 U. S. 40, 5 Sup. Ct. Rep. 346.