WOOD et al. v. SEWALL'S ADM'RS.

(District Court, E. D. Pennsylvania. February 12, 1904.)

No. 48.

1. SHIPPING—CLAIMS BY CHARTERER AGAINST OWNER—COUNSEL FEES PAID BY CONSIGNEE.

The charterers of a vessel to carry a cargo which they had sold for delivery in a foreign port cannot recover counsel fees paid by the consignee and deducted from the price of the cargo, the employment having been made because the master refused to deliver the cargo until payment of a claim for demurrage which was in dispute between him and the charterers, where the master's claim was reasonable and made in good faith.

2. SAME—CHARTER PARTY—REPRESENTATIONS BY OWNER AS TO CAPACITY OF SHIP.

A representation made by the owners of a ship as to her cargo capacity, which was a material inducement to the making of a charter, and without which the charter would not have been made, became a part of the contract where there was nothing inconsistent therewith in the charter, and the owners are liable to the charterers for the damages sustained by them because of the failure of the vessel to carry the tonnage represented.

3. SAME—DEMURRAGE.

A shipowner is not entitled to demurrage from a charterer for delay in the sailing of the vessel after she was loaded, which was due to the claim of the master that the cargo was in excess of that actually loaded, and his refusal to sign bills of lading for the correct quantity.

In Admiralty. Suit to recover damages for breach of charter party.

N. Dubois Miller and Biddle & Ward, for libelant.

Henry R. Edmunds, for respondent.

J. B. McPHERSON, District Judge. Early in February, 1901, the libelants, who are merchants of Philadelphia, and had a contract with the Dutch government to deliver 3,441 tons of iron pipe at the port of Soerabaya, on the Island of Java, not later than November 30, 1901, were looking about for a sailing vessel to carry this cargo. The ordinary length of a voyage from Philadelphia to Soerabaya is about three months, and they were anxious to secure a vessel that had capacity for the whole shipment, and would sail as soon as possible after April 10th, when the pipe was expected to be ready. Accordingly, Haldt & Cummins, who were their brokers in Philadelphia, inquired of Arthur Sewall & Co., of Bath, Me., who were owners of ships, whether they could furnish such a vessel as was desired. To this inquiry, which was apparently made on February 12th—the letter of that date is not in evidence—the following reply was sent on the next day:

"Your favor of the 12th inst. at hand, and we note shippers of the Soerabaya pipe are particularly anxious for an earlier ship. We have one that will come around about the latter part of April, but she will carry more than the one due the middle of May. The earlier ship will take about 4600 tons to load her, which we presume is more than your parties have to forward. We have nothing else that we can put before you at this time. Should you not find such a vessel as you want at the desired time, perhaps we can treat with you

¶ 3. Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

later. Our ship coming around in May is just right for the order. She carries 3400 tons, and is a fine steel ship insuring at a lower rate than wooden tonnage."

The brokers answered on February 15th, saying:

"Your favor of the 13th received. We are unable to interest the Soerabaya pipe shipper in your 3400 ton ship due in May, for two reasons, first, the contract calls for delivery at Soerabaya not later than October, and they fear she may be too late. Second, the pipe will be all ready by April 10th, and as the pipe is valued at $125,000 they will lose the interest on this amount for one month at least, which would mean a loss of $625 interest.

"If you will write us fully in a strain that will allow us to present your letter to the shipper, showing the position of the ship, giving her name, making her capacity as large as possible as the cargo may run slightly over 3400 tons, and showing when she would probably arrive at Soerabaya, we are sure it would have considerable effect and might influence them to decide to close with you, although we do not think that $9 per ton freight can be had, as you know they have been offered a steamer at 36/."

On the 16th, Sewall & Co. replied as follows:

"Your favor of the 15th inst. at hand.

"The ship we are talking for the Soerabaya order is the Kenilworth, now on passage from San Francisco to the U. K. She sailed on November 7th, and allowing ample time she should reach your port by the latter part of May. This certainly ought to put her into Soerabaya during the month of October. She is a fine steel ship. Her cargoes have run from 3400 to 3500 tons.

"As regards rate, while we feel that our ideas, as previously expressed, are not out of the way, we might endeavor to meet shippers' views and accept $8.50 provided they are inclined to favor the vessel; other terms as named in your letter under date the 8th inst."

These representations concerning the capacity of the ship induced the libelants to accept Sewall & Co.'s proposition, and on March 7th a charter party was agreed upon. This instrument described the ship as "of the burden of 2179 tons, or thereabouts, register measurement," and chartered her to the respondent for the voyage from Philadelphia to Soerabaya on the terms following, inter alia:

"The said vessel shall be tight, staunch, strong and in every way fitted for such a voyage, and receive on board during the voyage aforesaid, the merchandise hereinafter mentioned. The said party of the second part doth engage to provide and furnish to the said vessel, a full and complete cargo, both under and on deck, of cast iron water pipe, say about 3400 gross tons. Charterers to allow sufficient pipe to be reeved in loading the vessel, to enable the vessel to load to her usual dead weight capacity; certificate of proper loading by the surveyor of the port of Philadelphia to be furnished the shippers at ship's expense. * * * Vessel to report, ready to receive cargo, at Philadelphia not later than May 10, 1901; otherwise charterers have the option of cancelling this charter party. April loading desired. * * * Freight payable without discount or commission on proper delivery of cargo. * * * The pipe to be delivered alongside ship on lighters, as fast as it can be loaded."

Demurrage at the rate of $217 per day was agreed upon, and the vessel was to have an absolute lien on the cargo for freight, dead freight, and demurrage.

The ship was then in Liverpool, but she arrived in Philadelphia about the middle of April, and began taking in cargo on the 19th day of that month. Loading continued until May 9th, by which time all of the shipment, except 180 tons, had been put on board. At this point the vital question in dispute arises. The master refused to receive

any more cargo, declaring that the vessel was loaded down to her marks, and could not safely take the remaining tons. At this time she was drawing 22 feet $3^{1}/_{2}$ inches forward, and 21 feet $11^{1}/_{2}$ inches aft, with a freeboard of 4 feet 1 inch. The master testified that this was 3 inches lower than she had ever been before under his command, although he said that he had carried 3,465 tons on each of two other voyages, with 3 inches less draft. He insisted, therefore, that there must be some mistake about the weights that were marked on the pipe, and that he had already taken on board more than 3,400 tons. There was no dispute that the weights as marked showed that only 3,258 tons had been loaded, and the libelants contended that the weights were correct, but the master persisted in his refusal to take on any more cargo. He declined to sign the bills of lading offered by the libelants showing that only 3,258 tons were on board, and in consequence of this dispute the ship could not be cleared, and was delayed four days, while letters and telegrams were exchanged between Bath and Philadelphia. On May 11th the master made a formal protest, setting out his side of the controversy, and he was sustained by his owners in every particular. Finally the master tendered a bill of lading, which set out how many pipe had been shipped, "weight * * * unknown. Cargo to be weighed at destination at master's option, for determination of freight," and contained a clause claiming $868 demurrage for four days' detention. The libelants accepted this bill under protest, and the master put to sea without taking the remainder of the pipe on board. This was forwarded by two steamships from New York, via Singapore, and part of the claim in suit is for the additional expense thereby caused. When the Kenilworth reached Soerabaya, there was some difficulty about the payment of the freight, and after part of the cargo had been unloaded the master refused to deliver the rest until he should be paid, not only the freight, but also his claim for demurrage. The Dutch officials took the advice of several lawyers upon the matter, and finally followed their counsel and paid the master his full claim. There were no facilities for weighing the pipe at Soerabaya, and the freight was collected and paid upon the marked weight of 3,258 tons. The Dutch government deducted from the contract price the sums paid for demurrage and as fees to its own lawyers, and these two sums make up the balance of the libelants' claim.

Concerning the sum paid for fees, only a word need be said. The Dutch government may not have been justified in deducting them from the contract price, but I do not see how they can be recovered from the respondents. The master took no part in the employment of the lawyers, and no ground appears upon which his owners can be held liable for this money. It is true that the dispute between the libelants and the master was the reason why legal advice was needed, but the dispute was reasonable and in good faith upon both sides, and the libelants were as much or as little to blame for the controversy as the respondents. The libelants' claim for this sum should be made to the Dutch government.

The important question of fact in the case, as already stated, concerns the capacity of the ship, and the amount of cargo that was actually put on board. Here the testimony is in conflict, but I think the

libelants' testimony is better in quality and ought to prevail. Undoubtedly the ship was represented as capable of carrying 3,400 tons, and this was an essential inducement to the contract. Without such a representation, she would not have been chartered at all. This being so, it seems to me that the representation became a part of the contract, and that the contract would be broken if she should prove unable to carry the specified weight. The circumstances of the case, in my opinion, show that the parties regarded the correspondence on this subject as not merely words of expectation, but words of contract, to use the language of Morris v. Levison, L. R. 1 C. P. Div. 155. In Wilfred v. Myers (D. C.) 40 Fed. 170, a similar conclusion concerning a representation about capacity was reached. The syllabus of the case states the point decided:

"Brokers tendered to defendant a vessel, for charter, of a certain registered tonnage. Defendants, being unable to find the cubical capacity of the vessel described in any of the published ratings of vessels at that port, made inquiry of the brokers, who informed them that it was a certain amount, and defendants then agreed to accept it. A charter party was drawn up, in which defendants inserted the represented cubical capacity, but the brokers gave notice that they had no authority to guaranty cubical capacity, and it was agreed to send the charter party to the vessel's agents, who, on receipt of it, declined to guaranty the capacity. Held, that there was no contract, as the representation made by the brokers as to the capacity was, under the circumstances, a part of the contract on the part of the defendants, whatever it may have been on the part of the brokers."

In Clydesdale Co. v. Brauer Steamship Co. (D. C.) 120 Fed. 854, Judge Adams held that representations concerning the speed of a vessel were material under the facts there in proof, as the following paragraph from the opinion will show:

"The respondent desired to charter an eleven-knot steamer, which it made known to the owner through a broker in New York, where the negotiations took place, who cabled it to the owner's agent in Glasgow, who communicated it to the owner. An answering cable from the agent in Glasgow was sent to the broker in New York, which, among other things, contained a statement that the vessel's average speed was eleven knots an hour, which it was computed by the agent would save the charterer from £100 to £250 per month over vessels of less speed. This was exhibited by the broker to the Brauer Company. I hold that the representation was material, and, if it was untrue, the charterer was entitled to rescind the contract, provided it exercised due diligence in asserting the right."

In Bacon v. The Poconoket (D. C.) 67 Fed. 262, Judge Butler had occasion to consider a similar question in this district, and enforced a representation concerning title, because it was material and had induced the making of the contract. And in Mackill v. Wright, L. R. 14 App. Cas. 106, a marginal note upon a charter party, concerning the character of the cargo, was held to override a guaranty that the ship would carry 2,000 tons dead weight. Lord Watson said:

"During the same meeting at which the charter party was signed (whether before or after signature does not clearly appear), a note, unauthenticated by their subscription or otherwise, was by consent of both parties written upon its margin, specifying the 'largest pieces' of machinery which were to be included in the cargo, by number, weight, and measurement. These, as described in the note, were to consist of twenty-three pieces in all, of which twenty appear to have required about 375 tons stowage space, calculated at 40 cubic feet per ton, with an aggregate dead weight of 209 tons. For the purposes

of this case, it is not necessary to consider whether the note in question ought to be regarded as pars contractus, or as an unsigned jotting, because in either view it leads practically to the same legal result. Assuming it to be a mere memorandum, it nevertheless amounts to a distinct representation by the charterers that the appellants would not be required, under their guaranty, to carry more than twenty-three pieces of machinery of the size and character which it describes. That being the case, if the fact that the Lauderdale did actually stow and carry only 1,690 tons dead weight of cargo was attributable to the respondents having sent forward large machinery in excess of their representation, their claim to a ratable deduction from freight is as effectually barred as if the representation had been embodied in the contract, and made an express condition of the guarantee."

No doubt, where the writing is inconsistent with the representations, the rule concerning the effect of parol evidence upon a written instrument may require a different conclusion, but, in my opinion, there is no such inconsistency here. Upon the contrary, the charter party itself distinctly states that a full and complete cargo shall consist of "about 3400 tons," and, when the previous correspondence is looked to for light concerning the meaning of the word "about," it will be seen at once that the parties evidently intended it to mean somewhat more than 3,400 tons, rather than somewhat less; for the libelants' brokers wrote, on February 15th, that "the cargo may run slightly over 3,400 tons," and it was in reply to this statement that Sewall & Co. declared "her cargoes have run from 3400 to 3500 tons."

How much, then, did she actually take on board? As already stated, I think the weight of the evidence is in favor of the libelants upon this point. The master's testimony concerning two previous cargoes that are said to have weighed 3,465 tons each was uncorroborated, although one of them had just been delivered at Leith, and evidence from other persons concerning the weight of each must have been available. Upon the other hand, the evidence concerning the method of weighing and marking the pipe by the manufacturers shows that so large an error as 180 tons would be almost impossible to make, especially when it is borne in mind that the weighing was checked by inspectors sent over by the Dutch government for the very purpose of watching the manufacture. I am forced to the conclusion, therefore, that the master had only 3,258 tons on board when he refused to accept the rest of the shipment, and that he was wrong in refusing to accept the bills of lading that were offered by the libelants. No doubt he was perfectly honest in the position he assumed, but he took the chance that he might be wrong, and, as he is now shown to have been mistaken, the delay of four days must be laid to his own account. Moreover, if he had tendered at first the bills of lading that he finally offered, they might have been accepted then under protest, as they were at last, and the delay might thus have been avoided.

Unless the items of their bill are disputed, the libelants are entitled to a decree for the amount of their claim, except the counsel fee of $80. If a dispute exists, a commissioner will be appointed.